**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| ELIAS SAVADA, an individual, on behalf of himself and all others similarly situated, *9923 Carter Road, Bethesda, Montgomery County, Maryland 20817,*<br><br>    *Plaintiff,*<br><br>  v.<br><br>RRH ENERGY SERVICES, LLC, SPRING ENERGY RRH, LLC, and RICHMOND ROAD HOLDINGS, LLC, Delaware limited liability companies, KIWI ENERGY NY LLC, a New York limited liability company, STEPHEN ESKRIGGE, DONALD CHEESMAN, RICHARD BOOTH, MICHAEL LORDI, and LISA HAWKINS, individuals, *240 Kent Avenue, Suite K3/A7, Brooklyn, New York 11249*, PALMCO ADMINISTRATION, LLC, d/b/a Indra Energy, *8751 18th Avenue, Brooklyn, New York 11214*, PALMCO POWER MD, LLC, d/b/a Indra Power, PALMCO ENERGY MD, LLC, d/b/a Indra Energy,, *7 St. Paul Street, Suite 820, Baltimore, Maryland 21202*<br><br>    *Defendants.* | No. 25-1156<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**DEMAND FOR JURY TRIAL**</u> |

**CLASS ACTION COMPLAINT**

   Plaintiff, Elias Savada ("Plaintiff' or "Savada") individually, and on behalf of all

others similarly situated, brings this action against RRH Energy Services, LLC, Spring Energy

RRH, LLC, Kiwi Energy NY LLC, Richmond Road Holdings, LLC, Stephen Eskrigge,

Donald Cheesman, Richard Booth, Michael Lordi, Lisa Hawkins, and PalmCo

Administration, LLC, PalmCo Power MD, LLC, and Palmco Energy MD LLC  for violations

of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq*. as well as the

Maryland Telephone Consumer Protection Act, Md. Com. Law § 14-3201, *et seq*. ("Maryland

TCPA"). In support of this Complaint, Savada asserts as follows:

<u>**Nature of the Case**</u>

1.      Plaintiff, individually and as proposed class representative for all others similarly situated, brings this action against Defendants for violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 et seq. ("TCPA") for unsolicited, "spoofed" telemarketing calls made by or on behalf of Defendants which deceptively market Defendants' services.

2.      Plaintiff, individually, and for class members, seeks an injunction and other equitable relief, and an award of statutory damages, and costs and reasonable attorneys' fees, to the members of the proposed classes.

3.      Savada's allegations in this complaint partly overlap prior class action lawsuits involving a different class representative (Nock)—but this lawsuit includes claims and allegations which were only developed afterwards. (*See* Complaint, *Nock v. Spring Energy RRH, LLC*, No. 1:23-cv-0104 (S.D.N.Y. Feb. 8, 2023), ECF No. 1 ("*RRH*"). *See also Nock v. Palmco Admin., LLC*, No. 1:24-cv-00662 (D. Md. Mar. 5, 2024), ECF No. 1 ("*Indra*").)

4.      This case (and the *RRH* and *Indra* cases) concern two different telemarketing campaigns for two different groups of Defendants:

>    (1)    from March 29 to May 11, 2021, RRH Energy Services, LLC, ("RRH"), Spring Energy RRH, LLC ("Spring"), Kiwi Energy NY LLC ("Kiwi"), Richmond Road Holdings, LLC ("Richmond"), and Stephen Eskrigge, Donald Cheesman, Richard Booth, Michael Lordi, Lisa Hawkins (together, "Individual Defendants," and with RRH, Spring, Kiwi, and Richmond, "**RRH**"); and

>    (2)    from May 17 and June 9, 2021, PalmCo Administration, LLC ("Indra Admin"), PalmCo Power MD, LLC and Palmco Energy MD LLC (together, "Indra MD," and with "Indra Admin," "**Indra**")).

5.      On February 5, 2025, the RRH Defendants filed their motion for summary judgment. (*See* Defendants' Memorandum of Law in support of Summary Judgment, *RRH*, ECF

No. 222.) RRH's motion contends that these campaigns occurred "[d]uring [the] same period," and that *Indra* was responsible for the calls to Nock alleged in *RRH*. (*Id.* at 10.) In effect, RRH's summary judgment motion advances an "empty chair" defense. The time for the *RRH* plaintiff to join additional parties or amend his pleadings ran on July 28, 2023. (Civil Case Management Plan and Scheduling Order, *RRH*, ECF No. 34.)

6.      RRH and Indra's telemarketing campaigns were separated by several days, and did not overlap. However, in the alternative to the foregoing, even if the Defendants' campaigns *did* overlap, Defendants bear the burden of proving that particular calls were not on their behalf under the alternative theory of vicarious liability:

> Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.

Restatement (Second) of Torts § 433B(3) (1965).[1] RRH and Indra hired the same team of telemarketers at different times. By doing so, RRH and Indra both "set in motion a dangerous force which embraces" the class alleged below and "made more difficult if not impossible the means of proving" who is liable for the TCPA violations alleged herein, such that "the onus [has] shifted to the wrongdoer[s] to exculpate" themselves. *Gardner v. Nat'l Bulk Carriers, Inc.*, 310 F.2d 284, 287 n.4 (4th Cir. 1962) (citation omitted, cleaned up).[2]

7.      "Courts applying alternative liability in its simplest form have sometimes required that all responsible parties be before the court and that each defendant have engaged in

---

[1]      *See Hamilton v. Accu-Tek*, 62 F. Supp. 2d 802, 839-40 (E.D.N.Y. 1999) (Restatement (Second) of Torts § 433B(3) (1965) "summarized" theory of "alternative liability" under *Summers v. Tice*, 33 Cal.2d 80, 199 P.2d 1 (1948)).

[2]      Unless RRH's "empty chair" defense fails as a matter of law, then this is the kind of case where "an inference at least as likely as competing inferences" warrants recovery. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007) (citing *Summers v. Tice*, 33 Cal.2d 80, 199 P.2d 1 (1948); Restatement (Second) of Torts § 433B (1965)).

simultaneous tortious conduct."[3] To address the kinds of defenses raised in *RRH* above, Savada brings a single complaint against both the RRH and Indra Defendants.

## The Parties

8.      Plaintiff Elias Savada is a citizen and resident of Maryland. He is the subscriber and user of a residential telephone number listed on the national Do Not Call list with a 301 area code, on which he received numerous unsolicited calls on Defendants' behalf.

9.      Plaintiff is a "person" as that term is defined by 47 U.S.C. § 153(39).

10.      Defendant RRH Energy Services, LLC ("RRH Energy") is a New York-based energy services management company operating several brands, including Spring Energy and Kiwi Energy, across multiple states, including Maryland. RRH is a Delaware limited liability company with its principal place of business located at 240 Kent Avenue, Suite K3/A7, Brooklyn, New York 11249.

11.      Defendant Spring Energy RRH, LLC ("Spring") does business as "Spring Power & Gas," and is licensed to supply retail electricity and natural gas in the states of Maryland, Pennsylvania, and New Jersey (which are physically supplied by the consumers' local utilities). Spring is a Delaware limited liability company with its principal place of business located at 240 Kent Avenue, Suite K3/A7, Brooklyn, New York 11249.

12.      Defendant Kiwi Energy NY LLC d/b/a Kiwi Energy ("Kiwi Energy") which is licensed to provide energy services in the states of New York and Ohio. Kiwi is one of Spring's corporate affiliates. Kiwi is a New York limited liability company with its principal place of business located at 240 Kent Avenue, Suite K3/A7, Brooklyn, New York 11249.

---

[3]      *Hamilton*, 62 F. Supp. 2d at 840 (citing *Ferrigno v. Eli Lilly & Co.*, 175 N.J. Super. 551, 420 A.2d 1305, 1314 (Law Div. 1980) for prospect that "presence of all tortfeasors before court not required"). *See also Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 342 n. 267 (S.D.N.Y. 2000).

13.    Defendant Richmond Road Holdings, LLC ("Richmond") is the parent company of RRH, Spring, and Kiwi. Richmond operates businesses across several states, including Kiwi Energy in New York and Ohio, and Spring Power in New Jersey, Pennsylvania and Maryland. Richmond is a Delaware limited liability company with its principal place of business located at 240 Kent Avenue, Suite K3/A7, Brooklyn, New York 11249.

14.    Defendant Stephen Eskrigge is one of Richmond's shareholders and investors. On information and belief, he resides in New Zealand.

15.    Defendant Donald Cheesman is one of Richmond's shareholders and investors. On information and belief, he resides in New Zealand.

16.    Defendant Richard Booth is one of Richmond's shareholders and investors. On information and belief, he resides in New York.

17.    Defendant Michael Lordi is one of Richmond's shareholders and investors. On information and belief, he resides in New York.

18.    Defendant Lisa Hawkins is one of Richmond's shareholders and investors. On information and belief, she resides in New York.

19.    Defendant Palmco Administration, LLC ("Indra Admin") is a New York limited liability company with its principal place of business located at 8751 18th Avenue, Brooklyn, New York 11214. Indra Admin is an energy services management company that operates several different energy and gas providers across several states as alleged below. It operates under the assumed name of Indra Energy, and all of its corporate affiliates alleged below do business using the same name.

20.    Defendants Palmco Power MD LLC and Palmco Energy MD LLC (together, "Indra MD") are Maryland limited liability companies which list their principal place of business

with the Maryland Public Service Commission as 7 St. Paul Street, Suite 820, Baltimore, Maryland 212021. In fact, the 7 St. Paul Street address is the address for Indra MD's agent for service of process, Corporation Service Company. On information and belief, Indra MD does not have a genuine office at the 7 St. Paul Street address (or anywhere else), and Indra Admin operates Indra MD (and its own business) from Indra Admin's office in Brooklyn. Since 2010, Indra MD has maintained licenses from the Maryland Public Service Commission to sell electricity and gas directly to consumers, which commodities are physically supplied by the consumers' local utilities. Indra MD is licensed to provide retail electricity and natural gas in the state of Maryland, and operates Indra's business in Maryland. Indra MD has affiliates licensed to provide gas and/or electricity in Connecticut, the District of Columbia, Delaware, Illinois, New Jersey, Massachusetts, Pennsylvania, and Virginia, all of which do business as "Indra Energy," and all of which are operated by Indra Admin from its office in Brooklyn.

21.    Plaintiff alleges all Indra Defendants acted in concert and as a joint enterprise at all times relevant to this matter.

22.    Each Defendant is a "person" as that term is defined by 47 U.S.C. §153(39).

23.    Defendants acted through their agents (including third party telemarketers), employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers. These individuals were and are at all relevant times, acting as Defendants' actual agents, ostensible agents, conspirators, partners and/or joint venturers and employees, and the acts alleged herein occurred within the course and scope of said agency, employment, partnership, joint venture, conspiracy or enterprise, and with the express and/or implied permission, knowledge, consent, authorization and ratification of Defendants. Each of these allegations are "alternative" theories of liability whenever not doing

so would contradict another allegation.

## Jurisdiction and Venue

24.    This Court has subject-matter jurisdiction over the TCPA claims in this action under 28 U.S.C. § 1331, which grants this court original jurisdiction of all civil actions arising under the laws of the United States. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 386-87 (2012) (confirming that 28 U.S.C. § 1331 grants the United States district courts federal question subject matter jurisdiction to hear private civil suits under the TCPA).

25.    Moreover, the Court has diversity jurisdiction. Savada is a citizen of Maryland. On information and belief, RRH, Spring, Richmond are Delaware and New York citizens, and Kiwi is a New York citizen. On information and belief, Eskrigge and Cheesman are citizens of New Zealand for purposes of diversity jurisdiction, and Booth, Lordi, Lisa Hawkins are citizens of New York. On information and belief, Indra Admin is a New York citizen and Palmco Power MD LLC and Palmco Energy MD LLC are citizens of Maryland and New York. The members of the proposed class are minimially diverse from the Defendants. Savada alleges the aggregate of the amount in controversy in these class claims exceed the sum or value of $5 million and the total number of class members exceeds 100. This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(d)(2).

26.    This Court has personal jurisdiction over the Defendants because Defendants caused tortious injury in Maryland, and transact business and perform work and services in Maryland. *Cf.* Md. Code Ann., Cts. & Jud. Proc. § 6-103(b).

27.    Defendants caused tortious injury in Maryland through these telemarketing calls. Specifically, Defendants purposefully and knowingly engaged telemarketers who called Savada on his 301 area code phone number, which is associated with the State of Maryland, and

thousands of other Maryland residents.

28.    **RRH:** The RRH Defendants regularly do or solicit business in Maryland and engage in a persistent course of conduct in Maryland by selling electricity and gas through Spring and operating Spring's business as alleged in more detail below, such that the Court has personal jurisdiction over Defendants under Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(4).

29.    The RRH Defendants' telemarketers enrolled customers with Maryland service addresses with Spring, and RRH, Richmond, and ultimately Richmond's investors derived substantial profits from the gas and electricity sold in Maryland via Spring, such that the Court has personal jurisdiction over Defendants under Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(4).

30.    In public, RRH Defendants hold themselves out as a joint enterprise operated by RRH, use a common email address and website at rrhenergy.us.

31.    **Indra:** Robert Vincent Palmese is the principal of each Indra Defendant. Palmese averred that he is Indra Admin's CEO, and that Indra Admin is "an administrative company that provides administrative services to its affiliates, including co-defendant" Indra MD. (ECF No. 20-2 ¶6.)

32.    As alleged below, the "administrative services" Indra Admin provides to Indra MD include marketing to consumers and enrolling consumers with Maryland service addresses with Indra MD for gas and electricity, including making, arranging, or procuring telemarketing campaigns for Indra MD's benefit.

33.    Indra Admin caused tortious injury in Maryland through these telemarketing calls. Specifically, the Indra Defendants purposefully and knowingly called Nock (or caused him to be called) on his "410" and "443" area code phone numbers, which are associated with the State of Maryland.

34.     Indra regularly do or solicit business in Maryland and engage in a persistent course of conduct in Maryland by selling electricity and gas through Spring and operating Spring's business as alleged in more detail below, such that the Court has personal jurisdiction over Defendants under Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(4).

35.     Indra Admin regularly does or solicits business in Maryland and engages in a persistent course of conduct in Maryland by providing the "administrative services" that Indra Admin sells to Indra MD, such that the Court has personal jurisdiction over Indra Admin under Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(4).

36.     Indra Admin derived substantial profits from the gas and electricity sold in Maryland by Indra MD, and from the "administrative services" that Indra Admin sells to Indra MD, such that the Court has personal jurisdiction over Indra Admin under Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(4).

37.     Indra Admin's telemarketers enrolled customers with Maryland service addresses with Indra MD. Indra MD also compensates Indra Admin for the "administrative services" it uses in procuring and managing such operating the website at indraenergy.com, and Indra Admin derived substantial revenue from such services.

38.     Indra MD is listed on the Maryland Public Service Commission's lists of suppliers authorized to operate in Maryland at https://www.mdelectricchoice.com/shop/suppliers and https://www.mdgaschoice.com/shop/suppliers (attached to this Complaint as Exhibit 2). Indra MD (again, using Indra Admin personnel) provided this information to the Maryland Public Service Commission, including a link to indraenergy.com.

39.     In public, Indra MD, Indra Admin, and their affiliates hold themselves out as a joint enterprise operating under the common name "Indra Energy."

40.    Indra Admin owns and operates website at https://indraenergy.com. The "terms of use" for the Indra website states "Indra Energy is sometimes referred to herein as 'Indra' or 'we,' 'us' or 'our' and refers to Palmco Administration, LLC d/b/a Indra Administration and its affiliates."

41.    Indra does not maintain individual websites for the individual Indra affiliates. Rather, indraenergy.com (i.e., Indra Admin's website) is the only website where consumers can enroll with Indra.

42.    Indra Admin affirmatively takes the steps necessary to enroll Indra MD customers for utility services for Maryland addresses at indraenergy.com and thereby receives revenue from indraenergy.com.

43.    Hence, Indra Admin used the Maryland Public Service Commission's websites to refer potential Indra MD customers to Indra Admin's indraenergy.com website, where could enroll with Indra MD. Hence, the indraenergy.com website is one of the through lines that connect Maryland consumers, Indra MD, and Indra Admin.

44.    By sending the Indra Admin webpage to the Maryland Public Services Commission for the purpose of enrolling Maryland customers, Indra Admin knowingly and purposefully availed itself to the State of Maryland.

45.    Because one or more Defendant is headquartered in this District and a substantial portion of the events and occurrences underlying this action occurred within this District, venue is proper under 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(b)(2).

46.    Defendants acted through their agents (including third party telemarketers), employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers. These individuals were and are at all relevant times,

acting as Defendants' actual agents, ostensible agents, conspirators, partners and/or joint

venturers and employees, and the acts alleged herein occurred within the course and scope of

said agency, employment, partnership, joint venture, conspiracy or enterprise, and with the

express and/or implied permission, knowledge, consent, authorization and ratification of

Defendants. Each of these allegations are "alternative" theories of liability whenever not doing

so would result in a contradiction with the other allegations.

### The Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227

47.    "Americans passionately disagree about many things. But they are largely united

in their disdain for robocalls." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2343

(2020).

48.    In 1991, Congress enacted the TCPA, in response to a growing number of

consumer complaints regarding certain telemarketing practices. Congress found that "automated

and prerecorded calls are a nuisance and an invasion of privacy, regardless of the type of call,"

and decided that "banning" such calls made without consent was "the only effective means of

protecting telephone consumers from the nuisance and privacy invasion." Pub. L. No. 102-243,

§§ 2 (10-13) (Dec. 20, 1991), codified at 47 U.S.C. § 227. *See also Mims*, 565 U.S. at 371 ("The

Act bans certain practices invasive of privacy").

49.    The TCPA (via its implementing FCC regulations) prohibit telemarketing calls to

any number that is registered with the National Do-Not-Call Registry. *See* 47 U.S.C. § 227(c)(5);

47 C.F.R. § 64.1200(c)(2). The TCPA provides a private right of action for damages and

injunctive relief for such DNC violations. 47 U.S.C. § 227(c)(5).

50.    The National Do-Not-Call Registry allows residential telephone subscribers to

register their telephone numbers with the Registry to indicate their desire not to receive

telephone solicitations at those numbers. *See* 47 C.F.R. § 64.1200(c)(2). A listing of the Registry "must be honored indefinitely or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id.*

51.     The Federal Communications Commission ("FCC") has promulgated regulations under the TCPA which also require that sellers and telemarketers maintain an "internal do-not-call list" ("IDNC" list) — i.e., a "list of persons who request not to receive telemarketing calls made by or on behalf of that [seller]" — and further prohibits sellers from "initiat[ing] any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls by or on behalf of that person or entity[.]" 47 C.F.R. § 64.1200(d). Cf. 47 U.S.C. § 227(b)(1).

52.     The TCPA reflects Congress's intent to preserve the social norms that Americans answer calls to their telephone numbers. Abusive and deceptive robocalls like those used by Defendants are a scourge on modern society, and represent an increasing threat to American's continued use of the telephone system, which relies on the custom that people generally answer telephone calls to their telephone number. The TCPA's legislative history recognized the continued proliferation of telemarketing, left unchecked, would undermine that custom. "Unwanted calls are tainting the wanted ones and make us cringe at the thought of answering the telephone at night. . . .[I]t's a classic case of the bad apples spoiling the whole barrel." 137 Cong. Rec. H11,312 (daily ed. Nov. 26, 1991) (statement of Rep. Cooper); 137 Cong. Rec. H11,310 (daily ed. Nov. 26, 1991) (statement of Rep. Markey) (TCPA intended to protect privacy "before our home telephones become the receptacles of junk calls in the same way that junk mail often inundates our mailboxes"). The situation has greatly worsened since the TCPA was first passed.

Unless the situation improves, Americans will permanently acclimate to the telephone call as a fundamentally untrustworthy medium for free speech and stop answering unidentified telephone calls, frustrating the legislative intent behind the TCPA.

53.     The situation has greatly worsened since the TCPA was first passed. Unless the situation improves, Americans will permanently acclimate to the telephone call as a fundamentally untrustworthy medium for free speech and stop answering unidentified telephone calls, frustrating the legislative intent behind the TCPA.

### RRH's Business

54.     The Individual RRH Defendants collectively operate RRH's business as a unified joint venture. Spring provides retail electricity and natural gas services in New Jersey, Maryland, and Pennsylvania, pursuant to licenses maintained with the relevant regulatory agencies in those states. Kiwi provides retail electricity and natural gas services in New York and Ohio, under analogous licenses.

55.     RRH operates Spring and Kiwi as different brands in different states. All RRH's employees use email addresses with the rrhenergy.us domain name, and their email signatures contain RRH's logo and list "RRH Brands" (including Kiwi and Spring). The rrhenergy.us website describes "RRH Energy Services" as "a New York based energy services management company overseeing businesses across multiple states."

56.     In 2020, RRH issued a press release stating that Richmond "operates businesses across several states," including Spring, and provided a link to the "RRH Energy portfolio of brands" at RRH's website.

57.     RRH's primary creditor keeps separate liens on RRH, Richmond, and Spring.

58.     RRH employs, controls, and supplies the individual natural persons—the officers,

employees, and agents—who actually operate and control Spring and Kiwi's day-to-day

businesses. RRH also supplies personnel who are responsible for developing standards and

qualifications for RRH's sales agents, training those sales agents, and operating quality assurance

programs to identify problems in RRH's marketing process. During RRH's quality control

processes, RRH develops, records, and reviews its enrollment records (including enrollments

with Spring) before paying commission to RRH's sales agents for those enrollments. Hence,

RRH's quality control process provides it control over RRH's sales agents from enrollment to

enrollment.

59.     In contrast, Spring has no employees and no assets except for a single bank

account, and the licenses, bonds, and other records required by regulation to sell electricity and

gas. Spring is a corporate shell used to (1) hold and maintain its gas and electricity licenses; (2)

collect customer payments; (3) trade energy supplies; and (4) RRH's marketing contracts with

their vendors enrolling consumers in New Jersey, Maryland, and Pennsylvania. It has no

employees and little or no other operations or business function.

60.     Kiwi does have some employees, which provide services for Spring together with

RRH. (In addition or the alternative, Kiwi employed all RRH's employees.) Most of RRH's

expenses—including Richmond's dividends—are paid by Kiwi from Kiwi bank accounts. On

information and belief, Richmond does not have its own bank account (or it is unused).

61.     RRH employees managed Spring and Kiwi by procuring sales agents and

providing quality assurance for their enrollments. Conversely, Richmond has investors

(including the Individual Defendants identified above) and "staff members" who act on its

behalf. Richmond signed the RRH Defendants' contract with their third-party verification (TPV)

service provider ("TPV.com"), as well as the non-disclosure agreement with Endurance Sales

and Marketing LLC ("Endurance," the vendor who arranged the telemarketing calls to Savada alleged herein). Both of these contracts were essential to the RRH Defendants' telemarketing scheme alleged below.

62.    The Individual Defendants attended weekly management meetings where they issued sales directives which resulted in onboarding Endurance, approved onboarding Endurance, approved commissions paid to Endurance, and approved terminating Endurance after the events alleged herein to conceal the RRH Defendants' involvement and complicity in Endurance's scheme.

63.    Through their weekly management meetings, the Individual Defendants were closely involved with monitoring, controlling, and managing the RRH Defendants' telemarketing campaigns. The RRH Defendants operate, manage, monitor, and/or control these telemarketing campaigns through the data collected about the telemarketing campaigns, and the feedback the RRH Defendants give to the telemarketers (including, ultimately, the commissions the Individual Defendants approve and the RRH Defendants pay to their telemarketers).

### Indra's Business

64.    On information and belief, Indra Admin employs, controls, and supplies the individual natural persons—the officers, employees, and agents—who actually operate and control Indra MD's day-to-day business, including executing contracts or regulatory certifications for Indra MD, enrollment and verification, billing, financing and accounting, operations and database solutions (including interfacing with the utilities that physically supply the electricity and gas that Indra sells to consumers), marketing and public relations strategy (including managing its telemarketing and other sales channels), financial forecasting and budgeting, procurement, risk management, and every other function of Indra MD.

65.     On information and belief, Indra MD and other licensed Indra affiliates are simply corporate shells used to (1) hold and maintain their gas and electricity licenses; (2) collect customer payments; and (3) trade energy supplies.

66.     Indra MD has no employees of its own. Indra Admin supplies all of Indra MD's personnel.

67.     In the alternative, Indra MD has few employees of its own, and they are not responsible for the conduct alleged in this complaint.

68.     Indra Admin's employees and agents (and specifically including Robert Palmese, Indra Admin's CEO) are responsible for the conduct alleged in this complaint.

69.     Palmese makes all the decisions concerning Indra MD, and is Indra MD's managing member and only officer.

70.     While making decisions for Indra MD and operating Indra MD's business, Palmese is employed by and acts as Indra Admin's agent.

71.     Because Indra Admin and Indra MD are owned and operated by the same people (including Palmese), it is not possible to attribute the actions of these individuals to Indra Admin or Indra MD without also attributing them to each other.

72.     Indra MD compensates Indra Admin for the "administrative services" it uses in owning and operating the website at indraenergy.com, and Indra Admin derives substantial revenue from such services.

73.     Palmese is responsible for Indra MD's operations.

74.     When Palmese operates Indra MD's business, he is rendering "administrative services" to Indra MD on Indra Admin's behalf. Again, Indra MD's only personnel are supplied by Indra Admin.

75.     In the alternative, Palmese has consciously avoided knowing about Indra Admin's telemarketing practices.

76.     Before the events alleged in this complaint, Palmese had actual knowledge of the kinds of potential vulnerabilities and weaknesses in their regulatory compliance programs that put them on notice of the type of TCPA violations alleged herein. Indra's Pennsylvania affiliate settled a TCPA class action in 2020. (*See Abramson v. PALMco Energy PA LLC*, No. 2:19-cv-1675 (W.D. Pa. Sept. 2, 2020), ECF No. 49-1.)

77.     As it relates to Indra's compliance practices, Indra's former counsel summarized Indra's regulatory history this way:

> [Between 2010 and 2016] and up to the present, the various [Indra] entities have been investigated, fined, and otherwise penalized by attorneys general and regulators in at least 7 states throughout the country. These attorneys and regulators allege a severe pattern of fraudulent and improper marketing and sales behaviors perpetrated against some of the most vulnerable citizens. For example, there are allegations that [Indra] sales and marketing personnel impersonated employees of local utility companies, signed up customers without their knowledge or consent, entering customer homes under false pretenses, stole from customers, and even threatened customers with worse rates if they did not sign up with [Indra].

(Memorandum of Law in Support of Defendants' Motion for Partial Summary Judgment, *PalmCo Energy NJ, LLC, et al. v. Cullen and Dykman LLP, et al.*, No. ESX-L-4491-18 (N.J. Sup. Ct., Essex Cty., Nov. 5, 2021), Trans ID LCV20212583926, at 1.)

78.     Palmese has personally authorized multiple settlements for widespread consumer law violations arising from Indra's marketing, and had actual notice of the prevalence of TCPA violations in Indra's marketing channels.

79.     The Indra Defendants collectively operate Indra's business as a unified joint venture. Indra MD provides retail electricity and natural gas services in Maryland, pursuant to a license maintained with the Maryland Public Service Commission.

**Defendants' Illegal Telemarketing**

80.    **RRH:** The RRH Defendants collectively procure or authorize procurement of sales agents to enroll customers with Spring and Kiwi. The RRH Defendants collectively authorize, operate, and/or control telemarketing campaigns to acquire additional residential consumer customers for Spring and Kiwi. The RRH Defendants collectively authorize, operate, and/or control Spring and Kiwi's "quality assurance" programs, train their sales agents, and perform audits in response to customer complaints about their marketing.

81.    The RRH Defendants solicit potential residential customers in several states to purchase Spring's products and services through aggressive, outbound telemarketing campaigns. These telemarketing campaigns are conducted for the collective benefit of the RRH Defendants and on their behalf, in order to enroll new Spring and Kiwi customers. All RRH Defendants operate, manage, monitor, control, and benefit from these telemarketing campaigns. Accordingly, Savada alleges the RRH Defendants acted in concert and as a joint enterprise at all times relevant to this matter.

82.    **Indra:** The Indra Defendants collectively procure or authorize procurement of sales agents to enroll customers with Indra MD and other Indra affiliates. The Indra Defendants collectively authorize, operate, and/or control telemarketing campaigns to acquire additional residential consumer customers for Indra MD. The Indra Defendants collectively authorize, operate, and/or control Indra MD's "quality assurance" programs, train their sales agents, and perform audits in response to customer complaints about their marketing.

83.    The Indra Defendants solicit potential residential customers in several states to purchase Indra MD's products and services through aggressive, outbound telemarketing campaigns. These telemarketing campaigns are conducted for the collective benefit of the Indra

Defendants and on their behalf, in order to enroll new Indra MD customers. All Indra Defendants operate, manage, monitor, control, and benefit from these telemarketing campaigns. Accordingly, Savada alleges the Indra Defendants acted in concert and as a joint enterprise at all times relevant to this matter.

84.    **The Scheme:** Defendants knew about a scheme to disguise telemarketing calls as door-to-door sales. This scheme is "an open secret" in their industry. After Richmond signed a NDA with Endurance, the RRH Defendants hired Endurance knowing that it was involved in this scheme. Likewise, the Indra Defendants hired Neil St. Louis knowing that he was involved in this scheme. Ultimately Endurance and St. Louis ultimately brokered the same team of sales agents working in a call center called AJ & Company, in Sargodha, Pakistan for different telemarketing campaigns during different dates for RRH and then Indra.

85.    While Defendants ostensibly contracted to procure "door-to-door" sales agents, they knew that they were actually procuring a telemarketing campaign. The telemarketers who conducted this campaign disguised their telemarketing as door-to-door sales activity. After a consumer agreed to enroll, the telemarketers logged into in a third-party verification service (TPV.com) and transmitted data (including falsified GPS data) needed to enroll the consumer (with RRH or Indra, respectively), which led to TPV.com's subsequent recorded verification call. At the end of their call with the consumers, the telemarketers coached the consumers to lie during TPV.com's recorded verification call, and say they met with the sales agent in person.

86.    RRH routinely made recorded quality assurance "welcome" calls to new customers after TPV.com's verification call. From RRH's perspective, the ideal customer had been recorded saying he had met with the sales agent in person in both the verification and QA calls. In fact, on information and belief, most of RRH's vendors used this same scheme.

87.    The Endurance campaign ran from March 29 to May 11, 2021, when RRH could no longer overlook discrepancies in the GPS data for Endurance's enrollments that placed the Endurance sales agents in Pakistan.

88.    Richmond's individual investors are personally liable because they participated in weekly management meetings (over Microsoft Teams) where they personally authorized and/or ratified sales directives and related decisions at every stage of Defendants' marketing process. Richmond's individual investors had enough exposure to Defendants' marketing and quality assurance processes through their weekly management meetings to know that any sales directive would result in illegal telemarketing. Richmond's individual investors specifically attended meetings where they personally approved (and/or acquiesced to) the sales directive that led Defendants to hire Endurance, as well as onboarding Endurance, approving Endurance's commissions, and terminating Endurance's campaign. Richmond's individual investors knew that Defendants provided sales agents (like Endurance) credentials to log into TPV.com to enroll consumers, and personally approved (and/or acquiesced to) paying commissions to Endurance, and keeping most of the consumers (and profits) from Endurance's campaign, even after ending the campaign. In the alternative, Richmond's individual investors deliberately and willfully avoided knowing learning about Defendants' telemarketing practices.

89.    After a brief pause in their calls, Neil St. Louis hired the same team of telemarketers to conduct the same kind of disguised telemarketing campaign for Indra. Indra's campaign ran from May 11 to June 9, 2021. Indra had not reactivated St. Louis's team in TPV.com before May 10, 2021, because St. Louis had not completed a background check on the identities he provided Indra to authorize TPV.com credentials.

90.    Defendants systemically fail to honor the national Do Not Call List. Defendants

do not have express consent to call telephone users whose telephone number is on the Do Not Call List.

91.    Defendants and their agents make repeated and unwanted calls to consumers whose telephones service numbers are listed on the National Do Not Call Registry. Consumers place their phone numbers on the National Do Not Call Registry for the express purpose of avoiding unwanted telemarketing calls like those alleged here.

92.    On information and belief, Defendants also utilize misleading or inaccurate caller identification information, including "spoofed" telephone numbers with local area codes (that is, replacing the actual originating number displayed to recipients' caller ID systems—which could be used to reliably identify the vendors' calls—with a falsified ostensible outgoing telephone number). Defendants' use of spoofing entices recipients to answer telephone calls that they would not otherwise answer, and makes it difficult to attribute particular calls to Defendants. These practices allow Defendants to evade accountability for their telemarketing activities, and make it difficult for call recipients to avoid or otherwise respond to Defendants' calls (for instance, asking to be placed on Defendants' own Do Not Call list). Call recipients are only able to avoid Defendants' unwanted calls if they risk missing wanted calls, and cannot identify which companies they have instructed not to call them.

93.    RRH, Indra, and their agents use pre-recorded and/or artificial voices to make telephone calls to consumers *en masse* to promote and market their respective products and services.

94.    By making these robocalls, and ignoring the national Do-Not-Call registry and Do Not Call requests, RRH and Indra have caused Savada and other class members actual injury and harm, including the aggravation, nuisance, and invasion of privacy that results from the receipt

of unsolicited and harassing telephone calls.

95.     Defendants operate, manage, monitor, and/or control these telemarketing campaigns through the data collected about the telemarketing campaigns, and the feedback Defendants give to the telemarketers (including, ultimately, the commissions Defendants pay to their telemarketers).

96.     Defendants are vicariously liable for their agents' TCPA violations. Defendants not only controlled the result of the work, but also the manner and means by which it was accomplished through interim instructions. Defendants also ratified any agents' conduct by accepting the benefits of the calls, including but not limited to enrolling customers generated by these calls into Spring and Indra MD's respective contracts, despite being aware that these calls were unsolicited and made in violation of the TCPA.

97.     Defendants are legally responsible for ensuring they and/or any third-party telemarketers complied with the TCPA, even if they themselves did not itself make the calls. Federal regulation requires Defendants to ensure that they could produce a "record of each telemarketing call" for five years. 16 C.F.R. § 310.5(a)(2), (e). Maryland law requires Defendants to closely manage their sales agents: they are permitted Indra to third parties as their sales agent, on the condition that they are ultimately responsible for their sales agents' fraudulent, deceptive, or otherwise unlawful acts in the course of sales activities on Defendants' behalf. Code of Md. Regs. §§ 20.53.01.02(B)(1)(b), 20.53.10.02. Defendants are responsible for developing standards and qualifications for individuals they have chosen to hire as their sales agents, training those sales agents, and operating quality assurance programs to identify problems in their marketing process. Code of Md. Regs. §§ 20.53.10.03(A); 20.53.10.04(E).

98.     Defendants feign efforts at complying with the TCPA and other laws. These

efforts are not in good faith, but rather are intended to benefit from increasing expanding the number of such violations, while still avoiding liability—but not to actually prevent these violations in the first place.

99.    Defendants' scheme was specifically adapted to circumvent the consumer protections in paragraph 94 above (and the TCPA). By disguising these telemarketing campaigns as door-to-door sales activity, Defendants cultivated plausible deniability that they had notice of the TCPA violations committed by their ostensible "door-to-door" sales agents. Defendants used the scheme to enroll customers and keep the proceeds while knowingly, intentionally, and deliberately violating the law.

100.    If Defendants genuinely wanted to prevent TCPA violations, they would behave very differently. Defendants do not (1) thoroughly investigate their sales agents, and verify that their vendors are likely to comply with the TCPA before they hire them; (2) adequately monitor their enrollment processes to detect TCPA violations (like continuously recording door-to-door sales agents' GPS coordinates in between enrollments); or (3) fully investigate evidence of TCPA (or other consumer law) violations, and terminate and/or discipline vendors and/or their own employees (rather than performatively terminating individual sales agents).

101.    For instance, Defendants could readily detect and weed out telemarketers disguising their telemarketing as "door-to-door marketing," by require their door-to-door sales agent to continuously record their GPS coordinates while engaged on Defendants' app (including by means of an app on their mobile device). Defendants do not track sales agents' GPS coordinates—but instead only use the TPV process to capture GPS coordinates at the time of enrollment, which the telemarketers can fabricate much more easily.

102.    The third-party telemarketers used by Defendants to make calls to Savada or other

class members were and are at all relevant times, acting as Defendants' actual agents, ostensible

agents, co-conspirators, partners and/or joint venturers and employees, and the acts alleged

herein occurred within the course and scope of said agency, employment, partnership, joint

venture, conspiracy or enterprise, and with the express and/or implied permission, knowledge,

consent, authorization and ratification of Defendants.

103.    Each of these allegations are "alternative" theories of liability whenever not doing

so would result in a contradiction with the other allegations.

104.    The FCC has held that sellers may not avoid liability by outsourcing

telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing
> activities to unsupervised third parties would leave consumers in many cases
> without an effective remedy for telemarketing intrusions. This would particularly
> be so if the telemarketers were judgment proof, unidentifiable, or located outside
> of the United States, as is often the case. Even where third-party telemarketers are
> identifiable, solvent, and amenable to judgment limiting liability to the
> telemarketer that physically places the call would make enforcement in many
> cases substantially more expensive and less efficient, since consumers (or law
> enforcement agencies) would be required to sue each marketer separately in order
> to obtain relief.

*In re Dish Network, LLC,* 28 FCC Rcd 6574, 6588, ¶37 (2013) (citations omitted).

105.    There is no material distinction between telemarketing calls made by Defendants

and/or by telemarketers who are technically third parties. Defendants are liable for their

telemarketers' telemarketing calls. The FCC's regulations "generally establish that the party on

whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the

Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC

Rcd. 12391, 12397, ¶13 (1995). *See Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 168 (2016)

("no cause to question" precept that "under federal common-law principles of agency, there is

vicarious liability for TCPA violations"); *Jones v. Mutual of Omaha Ins. Co.*, 639 F. Supp. 3d

537, 551 (D. Md. 2022) ("'vicarious liability under the TCPA is governed by the federal common law of agency,' under which an agency relationship may be established by way of (1) actual authority; (2) apparent authority; or (3) ratification," quoting *Hodgin v. UTC Fire & Sec. Am. Corp., Inc.*, 885 F.3d 243, 252 (4th Cir. 2018)).

**Savada's Individual Allegations**

106.    Savada placed his 301 area code residential telephone number on the National Do Not Call Registry since June 29, 2003.

107.    Savada uses this telephone numbers for residential purposes. Savada never provided his telephone number to Defendants or their agents for any purpose whatsoever as he never had a business relationship with them. Defendants and their agents did not otherwise obtain Savada's prior express consent to make telemarketing calls to his telephone numbers. Savada was not a business associate, customer, or other person having an established relationship with Defendants. Defendants did not call to collect an existing obligation, and Savada did not request Defendants to call (and, indeed, he was not aware of Defendants prior to these calls). Defendants never had valid consent to call Savada. *See* 47 C.F.R. § 64.1200(c)(2)(ii) (requiring "a signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by this seller").

108.    On April 21, 26, 28, and 30, and May 3 and 7, 2021, Savada received unsolicited and unauthorized telemarketing calls to his 301 area code number by or on behalf of RRH, promoting Spring's products and/or services. On information and believe, the prerecorded message used in these calls stated, more or less: "This is an apology call from your electric company. You have been overcharged, and we're sending you a rebate, and you're getting a 30 percent reduction in your rate. Press 1 if you would like this rebate and reduction."

109.    On May 19 and 26, 2021, Savada received unsolicited and unauthorized telemarketing calls to his 301 area code number by or on behalf of Indra promoting Indra MD's products and/or services. On information and believe, these calls used a similar prerecorded message.

110.    Defendants' telemarketing inflicted actual injury on Savada by invading his privacy. Defendants caused Savada the harm inherent in repeated, unsolicited, harassing, and deceptive telemarketing calls (including emotional distress, aggravation, nuisance, loss of use of his telephone, wasted time, invasion of privacy, and diverting attention away from his daily activities). However, Savada does not seek actual damages in excess of the statutory damages authorized under the TCPA.

## Class Certification Allegations

111.    **Class Definition:** Plaintiff brings this Complaint against Defendants, pursuant to Federal Rule of Civil Procedure 23, on behalf of himself and the following six Classes:

> **NDNC Class:**
> All persons in the United States who received two or more telemarketing calls to their cellular or residential telephone numbers within any 12-month period by or on behalf of Defendants, from four years prior to the date of Plaintiff's original complaint through the date the Court certifies the class.
>
> **IDNC Class:**
> All persons in the United States who received two or more telemarketing calls to their cellular or residential telephone numbers within any 12-month period by or on behalf of Defendants, from four years prior to the date of Plaintiff's original complaint through the date the Court certifies the class, during which time(s) Defendants had not instituted or maintained the procedures or minimum standards required under 47 C.F.R. § 64.1200(d).
>
> **Pre-Recorded Call Class:**
> All persons in the United States who received one or more telephone calls to a residential telephone number using an artificial voice or pre-recorded voice to deliver a message, from four years prior to the date of Plaintiff's original complaint through the date the Court certifies the class.

**Maryland NDNC Class:**
All persons who received two or more telemarketing calls to their cellular or residential telephone numbers within any 12-month period by or on behalf of Defendants, from four years prior to the date of Plaintiff's original complaint through the date the Court certifies the class who resided in the State of Maryland at the time of the call(s).

**Maryland IDNC Class:**
All persons who received two or more telemarketing calls to their cellular or residential telephone numbers within any 12-month period by or on behalf of Defendants, from four years prior to the date of Plaintiff's original complaint through the date the Court certifies the class, during which time(s) Defendants had not instituted or maintained the procedures or minimum standards required under 47 C.F.R. § 64.1200(d), who resided in the State of Maryland at the time of the call(s).

**Maryland Pre-Recorded Call Class:**
All persons who received one or more telephone calls to a residential telephone number using an artificial voice or pre-recorded voice to deliver a message, from four years prior to the date of Plaintiff's original complaint through the date the Court certifies the class, who resided in the State of Maryland at the time of the call(s).

Excluded from the Classes are any entity in which Defendants have a controlling interest or which has a controlling interest in Defendants, and Defendants' owners, affiliates, agents, legal representatives, predecessors, successors, assigns, and employees. Also excluded are the judge and staff to whom this case is assigned, and any member of the judge's immediate family. Plaintiff reserves the right to revise and amend these class definitions based on facts learned during discovery.

112. **Numerosity:** The number of Class members exceeds 1,000. The Classes are so numerous that joinder of all members is impractical.

113. **Commonality:** Plaintiffs and the Class members share common experiences receiving calls by or on behalf of Defendants. They received multiple, incessant, uninvited calls for the purposes of marketing Defendants' services to their residential telephone numbers.

114. **Predominance:** In addition, common questions of fact and law exist as to all

Class members and predominate over the questions affecting only individual Class members. Identification of the individuals who qualify as a member of the Class will be sufficient to establish liability to the class member. The predominant common questions include:

    a.    Whether Defendants and/or their agents made telephone calls to members of the NDNC Class whose telephone numbers were registered with the national Do-Not-Call registry;

    b.    Whether Defendants and/or their agents made telephone calls to IDNC Class members while Defendants had failed to institute or maintain procedures and minimum standards required under 47 C.F.R. § 64.1200(d);

    c.    Whether Defendants and/or their agents utilized artificial or pre-recorded voices to deliver messages to the Pre-Recorded Call Class;

    d.    Whether Defendants and/or their agents violated Md. Com. Law § 14-3201 with respect to their agents' telephone calls to Maryland residents for the reasons given above;

    e.    Whether Defendants are vicariously liable for any calls by their agents;

    f.    Whether Defendants and/or their agents had legally effective consent to place telemarketing calls to Plaintiffs and Class members;

    g.    Whether Plaintiffs and Class members are entitled to damages, including whether Defendants' violations were performed willfully or knowingly such that Plaintiffs and Class members are entitled to treble damages;

    h.    Whether Plaintiffs and Class members are entitled to injunctive relief and attorneys' fees and costs.

    115.    **Typicality:** Plaintiff's claims are typical of the claims of the other Class members. Plaintiff is not different in any relevant way from any other Class members, and the relief they seek is common to the Class.

    116.    **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the other members of the Classes: Plaintiff's interests do not conflict with the interests of the other Class members. Plaintiff has retained counsel competent and experienced in complex class actions, including class actions arising under the TCPA and other

consumer protection laws, and they intend to prosecute this action vigorously.

117.    **Predominance and Superiority:** The Classes alleged in this Complaint are appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. The damages suffered by each individual Class member will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. It would be virtually impossible for Class members to individually obtain effective relief from Defendants' misconduct. Even if Class members themselves could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, class actions present far fewer management difficulties and provide the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

118.    **Generally Applicable Policies:** This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to each class a whole. The policies of the Defendants challenged herein apply and affect members of each class uniformly, and Plaintiffs' challenge of these policies hinges on Defendants' conduct, not on facts or law applicable only to Plaintiffs.

119.    **Injunctive Relief is Appropriate:** Based on information and belief, Defendants continue to engage in the improper practices discussed above. Injunctive relief is necessary and appropriate to enjoin Defendants' conduct and to prevent irreparable harm to Plaintiffs and Class

members for which they have no adequate remedy at law.

## FIRST CAUSE OF ACTION
### (Violation of 47 U.S.C. § 227(c)(5) and/or 47 C.F.R. § 64.1200(c) Against All Defendants By Plaintiff, Individually, and on Behalf of the NDNC Class)

120.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

121.    Defendants are "persons" as defined by 47 U.S.C. § 153(39).

122.    The TCPA provides that any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may" bring an action for injunctive relief and statutory damages of $500 per violation. 47 U.S.C. § 227(c)(5). Where "the court finds that the defendant willfully or knowingly violated the regulations prescribed under this subsection," it "may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount [otherwise] available . . ." *Id.*

123.    The FCC's TCPA regulation provides that "[n]o person or entity shall initiate any telephone solicitation" to a "residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 C.F.R. § 64.1200(c)(2). This prohibition also applies to wireless telephone numbers. 47 C.F.R. § 64.1200(e).

124.    On information and belief, Defendants and/or their agents routinely make outgoing calls to residential and cellular telephones in the regular course of their telemarketing campaigns alleged above. Defendants violated 47 C.F.R. § 64.1200(c) by initiating telephone solicitations to wireless and wireline residential telephone subscribers such as Plaintiff and the

other Class members.

125.    Defendants and/or their agents made more than one unsolicited telephone call to Plaintiff and DNC Class members within a 12-month period without their legally effective consent to receive such calls. Plaintiff and DNC Class members never provided any form of consent to receive telephone calls from Defendants, and Defendants do not have legally valid evidence of such consent. Defendants did not have an established business relationship with Plaintiff and the other DNC Class members.

126.    Defendants' violations are willful because Defendants knew or should have known that Plaintiff and DNC Class members had not given prior express consent to receive telemarketing calls made to telephone numbers placed on the Do Not Call List and that Defendants called such telephone numbers. Because Defendants' violations were willful, the Court should treble the amount of statutory damages recoverable by the Plaintiffs and the other Class members.

127.    Plaintiff, on his own behalf, and on behalf of the other DNC Class members, seeks to recover statutory damages (including treble damages for willful violation of the TCPA), as well as injunctive and equitable relief under 47 U.S.C. § 227(c)(5) against Defendants.

**SECOND CAUSE OF ACTION**
**(Violation of 47 U.S.C. § 227(c)(5) and/or 47 C.F.R. § 64.1200(d) Against All Defendants By Plaintiff, Individually, and on Behalf of the IDNC Class)**

128.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

129.    The TCPA provides that any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may" bring an action for injunctive relief and statutory damages

of $500 per violation. 47 U.S.C. § 227(c)(5). The FCC regulation also provides that

> No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:
>
> (1)    Written policy. Persons or entities making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.
>
> (2)    Training of personnel engaged in telemarketing. Personnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.
>
> ….
>
> (4)    Identification of sellers and telemarketers. A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges

47 C.F.R. § 64.1200(d). Again, this regulation also applies to wireless telephone numbers. 47 C.F.R. § 64.1200(e).

130.    On information and belief, Defendants and/or their agents violated 47 C.F.R. § 64.1200(d)(1) and/or (2) by failing to maintain a written policy for maintaining a do-not-call list and/or informing and training all personnel engaged in any aspect of telemarketing in the existence and use of the do-not-call list.

131.    On information and belief, Defendants and/or their agents violated 47 C.F.R. § 64.1200(d)(4) by failing to disclose the name of the individual caller, Spring's name, and a telephone number or address at which Spring could be contacted. Defendants also spoofed the outgoing telephone numbers used to call Savada and DNC Class members, and/or their telemarketers failed to identify Defendants.

132.    Defendants and/or their agents made more than one unsolicited telephone call to Plaintiff and DNC Class members within a 12-month period without their legally effective consent to receive such calls. Plaintiff and DNC Class members never provided any form of consent to receive telephone calls from Defendants, and Defendants do not have legally valid evidence of such consent. Defendants did not have an established business relationship with Plaintiff and the other DNC Class members.

133.    Defendants' violations are willful because Defendants knew or should have known that they failed to institute or maintain procedures and minimum standards required under 47 C.F.R. § 64.1200(d) in the manner alleged above, but still engaged in telemarketing. Because Defendants' violations were willful, the Court should treble the amount of statutory damages recoverable by the Plaintiffs and the other Class members.

134.    Plaintiff, on his own behalf, and on behalf of the other DNC Class members, seeks to recover statutory damages (including treble damages for willful violation of the TCPA), as well as injunctive and equitable relief under 47 U.S.C. § 227(c)(5) against Defendants.

### THIRD CLAIM FOR RELIEF
### Violation of 47 U.S.C. § 227(b)(1)(B) Against All Defendants
### by Plaintiff, Individually, and on Behalf of the Pre-Recorded Call Class

135.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint. Plaintiff asserts this claim on behalf of himself and the members of the Pre-Recorded Call Class.

136.    The TCPA prohibits certain uses of telecommunication equipment that would interfere with telephone service subscribers' privacy and/or property rights with respect to their telephone. In particular, the TPCA makes it unlawful for any person:

> to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior

express consent of the called party, unless the call is initiated for
emergency purposes or is exempted by rule or order by the Commission
under paragraph (2)(B).

47 U.S.C. § 227(b)(1)(B).

137.    The TCPA provides telephone service subscribers a private right of action for

injunctive relief and statutory damages for violations of 47 U.S.C. § 227(b) or "regulations

prescribed under" 47 U.S.C. § 227(b) "to enjoin such a violation" and/or to recover actual

damages or "$500 in damages for each such violation," as well as treble damages where the

"court finds that the defendant willfully or knowingly violated [47 U.S.C. § 227(b).]" 47 U.S.C.

§ 227(b)(3).

**FOURTH CLAIM FOR RELIEF**
**Violation of Md. Code, Com. Law, § 14-3201 Against All Defendants**
**by Plaintiff, Individually, and on Behalf of the Maryland NDNC Class**

138.    Plaintiff hereby incorporates by reference the allegations contained in all

preceding paragraphs of this complaint. Plaintiff asserts this claim on behalf of himself and the

members of the Maryland NDNC Class.

139.    Maryland law provides that a person may not violate the Telephone Consumer

Protection Act, 47 U.S.C. § 227, as implemented by the Federal Communications Commission in

the Restrictions on Telemarketing and Telephone Solicitations Rule (47 C.F.R. Part 64, Subpart

L). See Md. Code, Com. Law, § 14-3201.

140.    Maryland law provides that an individual who is affected by a violation of Md.

Code, Com. Law, § 14-3201 may bring an action against a person that violates this subtitle to

recover: (1) Reasonable attorney's fees; and (2) Damages in the amount of the greater of:  (i)

$500 for each violation; or (ii) Actual damages sustained as a result of the violation. See Md.

Code, Com. Law, § 14-3202. Maryland law further provides that each prohibited telephone

solicitation and each prohibited practice during a telephone solicitation is a separate violation. Id.

141.    For each violation set forth in Plaintiff's First Claim for Relief, Plaintiff asserts a

claim for statutory damages and reasonable attorneys' fees on behalf of the Maryland NDNC

Class for a corresponding violation of Md. Code, Com. Law, § 14-3201.

### FIFTH CLAIM FOR RELIEF
**Violation of Md. Code, Com. Law, § 14-3201 Against All Defendants
by Plaintiff, Individually, and on Behalf of the Maryland IDNC Class**

142.    Plaintiff hereby incorporates by reference the allegations contained in all

preceding paragraphs of this complaint. Plaintiff asserts this claim on behalf of himself and the

members of the Maryland IDNC Class.

143.    Maryland law provides that a person may not violate the Telephone Consumer

Protection Act, 47 U.S.C. § 227, as implemented by the Federal Communications Commission in

the Restrictions on Telemarketing and Telephone Solicitations Rule (47 C.F.R. Part 64, Subpart

L). See Md. Code, Com. Law, § 14-3201.

144.    Maryland law provides that an individual who is affected by a violation of Md.

Code, Com. Law, § 14-3201 may bring an action against a person that violates this subtitle to

recover: (1) Reasonable attorney's fees; and (2) Damages in the amount of the greater of:  (i)

$500 for each violation; or (ii) Actual damages sustained as a result of the violation. See Md.

Code, Com. Law, § 14-3202. Maryland law further provides that each prohibited telephone

solicitation and each prohibited practice during a telephone solicitation is a separate violation. Id.

145.    For each violation set forth in Plaintiff's Second Claim for Relief, Plaintiff asserts

a claim for statutory damages and reasonable attorneys' fees on behalf of the Maryland IDNC

Class for a corresponding violation of Md. Code, Com. Law, § 14-3201.

### SIXTH CLAIM FOR RELIEF
**Violation of Md. Code, Com. Law, § 14-3201 Against All Defendants**

**by Plaintiff, Individually, and on Behalf of the Maryland Pre-Recorded Call Class**

146.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint. Plaintiff asserts this claim on behalf of himself and the members of the Maryland Pre-Recorded Call Class.

147.    Maryland law provides that a person may not violate the Telephone Consumer Protection Act, 47 U.S.C. § 227, as implemented by the Federal Communications Commission in the Restrictions on Telemarketing and Telephone Solicitations Rule (47 C.F.R. Part 64, Subpart L). See Md. Code, Com. Law, § 14-3201.

148.    Maryland law provides that an individual who is affected by a violation of Md. Code, Com. Law, § 14-3201 may bring an action against a person that violates this subtitle to recover: (1) Reasonable attorney's fees; and (2) Damages in the amount of the greater of:  (i) $500 for each violation; or (ii) Actual damages sustained as a result of the violation. See Md. Code, Com. Law, § 14-3202. Maryland law further provides that each prohibited telephone solicitation and each prohibited practice during a telephone solicitation is a separate violation. Id.

149.    For each violation set forth in Plaintiff's Third Claim for Relief, Plaintiff asserts a claim for statutory damages and reasonable attorneys' fees on behalf of the Maryland Pre-Recorded Call Class for a corresponding violation of Md. Code, Com. Law, § 14-3201.

WHEREFORE, Plaintiff Elias Savada prays that the Court enter judgment and orders in their favor and against Defendant as follows:

a.    An order certifying the proposed Classes, directing that this case proceed as a class action, and appointing Plaintiff and his counsel to represent the Classes;

b.    Statutory damages as provided under 47 U.S.C. § 227(c)(5), including trebled damages for willful and knowing violations, against Defendants in favor of Plaintiff and the NDNC and IDNC Classes;

c.    Statutory damages as provided under 47 U.S.C. § 227(b)(3), including trebled

damages for willful and knowing violations, against Defendants in favor of Plaintiff and the Pre-Recorded Call Class;

e.      Statutory damages as provided under Md. Code, Com. Law, § 14-3202, including trebled damages for willful and knowing violations, against Defendants in favor of Plaintiff and the Maryland NDNC, Maryland INDC, and Maryland Pre-Recorded Call Classes;

f.      Injunctive relief against Defendants in favor of Plaintiff and the members of the Classes, under 47 U.S.C. § 227(b)(3) and/or § 227(c)(5); and

g.      Such other and further relief as this Court may deem appropriate.


Dated: April 7, 2025                    By:   s/Ethan Preston
                                        Ethan Preston (30836)
                                        ep@eplaw.us
                                        PRESTON LAW OFFICES
                                        4054 McKinney Avenue, Suite 310
                                        Dallas, Texas 75204
                                        Telephone: (972) 564-8340
                                        Facsimile: (866) 509-1197

                                        Jeremy R. Wilson (pro hac vice pending)
                                        jeremy@wilsonlawtx.com
                                        705 Ross Avenue
                                        Dallas, Texas 75202
                                        Telephone: (214) 662-8456
                                        Facsimile: (214) 594-8844

                                        *Attorneys for Plaintiff Elias Savada, on his own behalf, and behalf of all others similarly situated*

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: April 7, 2025         By:  _s/Ethan Preston_____

                                      Ethan Preston (30836)
                                      ep@eplaw.us
                                      PRESTON LAW OFFICES
                                      4054 McKinney Avenue, Suite 310
                                      Dallas, Texas 75204
                                      Telephone: (972) 564-8340
                                      Facsimile: (866) 509-1197

                                      Jeremy R. Wilson (pro hac vice pending)
                                      jeremy@wilsonlawtx.com
                                      705 Ross Avenue
                                      Dallas, Texas 75202
                                      Telephone: (214) 662-8456
                                      Facsimile: (214) 594-8844

                                      *Attorneys for Plaintiff Elias Savada, on his own behalf, and behalf of all others similarly situated*